(72 South. 812)

No. 20312.

SCHWING LUMBER & SHINGLE CO., Limited, v. PETERMAN et al.

(March 20, 1916. On Rehearing, Oct. 30, 1916.)

*(Syllabus by the Court.)*

1. CONSTITUTIONAL LAW ☞106 — CORPORATIONS ☞500 — POWERS AND LIABILITIES — REPRESENTATION BY OFFICERS — COMMENCEMENT OF ACTION.

The provision of section 16 of Act No. 267 of 1914, to the effect that the "no exception of want of authority shall lie on the part of any defendant" to any action brought on behalf of a corporation by the authority of its president, vice president, or manager, relates to the remedy, devests no vested right by operating upon pending litigation, and is decisive of the question of the right of a defendant and appellee in this court to urge an exception, filed in the trial court before the passage of the act, and assumed to be leveled at the capacity of the president of the corporation, plaintiff and appellant, to authorize the bringing of the suit.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 238, 257; Dec. Dig. ☞106; Corporations, Cent. Dig. §§ 1912, 1940, 1941; Dec. Dig. ☞500.]

2. LIMITATION OF ACTIONS ☞104½, New, vol. 6 Key-No. Series—PRESCRIPTION—COMPUTATION OF PERIOD—ACCRUAL OF CAUSE OF ACTION.

The mere pendency of negotiations with respect to a claim for damages for the unauthorized pulling of the timber of another does not operate to suspend the prescription of one year, against the action on such claim, as established by Act No. 33 of 1902, amending and re-enacting Civ. Code, art. 3537.

3. LIMITATION OF ACTIONS ☞197(2) — PRESCRIPTION—COMPUTATION OF PERIOD—IGNORANCE OF CAUSE OF ACTION.

This being an action in damages for the unauthorized pulling, by defendants, of timber belonging to plaintiff, the uncontradicted testimony, offered on behalf of plaintiff, as to the date upon which plaintiff received notice of the depredation, sufficiently establishes that date for the purposes of an exception of prescription, notwithstanding that it appears that the information might have been sooner acquired but for the fact that the ownership of the particular timber in question had been overlooked.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 724; Dec. Dig. ☞197(2).]

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Thomas M. Milling, Judge.

Action by the Schwing Lumber & Shingle Company, Limited, against W. T. Peterman and another. From a judgment for defendants, plaintiff appeals. Reversed and rendered.

Burke & Smith, of New Iberia, for appellant. Borah, Himel, Bloch & Borah, of Franklin, for appellees.

Statement of the Case.

MONROE, C. J. This is an action for the recovery of the value of timber, alleged to have been taken by defendants from the lands of plaintiff. The petition reads, in part, as follows:

"This, the petition of the Schwing Lumber & Shingle Company, Limited, a corporation duly chartered under the law of this state, domiciled in the parish of Iberville, and whereof Samuel P. Schwing is president, with respect, sets forth," etc.

It further alleges that plaintiff owns, and for many years has been in possession of, the cypress timber on portions of two certain sections of land in the parish of St. Martin to wit, S. W. ¼ of S. W. ¼ of section 31, and S. W. ¼ of N. E. ¼, N. E. ¼ of N. W. ¼, S. E. ¼ of N. W. ¼, N. E. ¼ of S. W. ¼, and S. E. ¼ of section 36 (more fully described in the petition); that defendants have, without right, taken 55,700 feet of timber from S. W. ¼ of said section 31, and 393,019 feet from the other tracts, in section 31; that plaintiff discovered the depredation, in section 31, on May 16, 1908, and in section 36, on November 5, 1909; that, upon the discovery first made, the matter was brought to the attention of defendants, who promised an adjustment, which they have never made; and that there was a similar happening upon the second discovery. Plaintiff claims $13,461.57, as the value of the timber so taken, when sawed into lumber, or, in the alternative, $3,141.03, as the timber value. By supplemental petition, a further aggregate sum of $10,000 is claimed for alleged damage to timber not actually removed, but prepared for cutting, and for loss that plaintiff alleges that it will sustain in its cutting and removal.

Defendants excepted to the authority of the "plaintiff company" to bring the suit, and to the sufficiency of its allegations; and, their exceptions having been overruled, they filed an answer, alleging ownership of certain described tracts of land in the parish of St. Martin, including the following portions of the sections described in plaintiff's petition, to wit: W. ½ of N. W. ¼, N. E. ¼ of N. W. ¼, N. ½ of N. E. ¼, S. E. ¼ of N. E. ¼, N. W. ¼ of S. W. ¼, and S. W. ¼ of N. W. ¼ of section 31; and S. E. ¼ of N. E. ¼ and N. W. ¼ of N. E. ¼ of section 36. They further allege that, in 1907, they arranged with C. D. Craighead to pull the timber from their land at an agreed price per 1,000 feet, and that, if he pulled from plaintiff's land, he did so without defendants' knowledge or authority, and that he, and not defendants, should be held liable therefor.

Further answering, and only in the event that it should be shown that Craighead pulled timber from plaintiff's lands, defendants allege that plaintiff, through its agent, had actual knowledge of such pulling more than a year before the institution of this suit, and hence they plead the prescription of one year.

After hearing the evidence, the judge a quo sustained the plea of prescription, and dismissed the suit, and plaintiff has appealed. Defendants have answered, praying that the exception of want of authority be sustained.

The two sections, or fractional sections, here in question, adjoin each other; section 31 lying to the eastward, in T. 14 S., R. 12 E., and section 36, to the westward, in T. 14 S., R. 11 E., and the relative positions of the tracts in which these litigants are interested will be better understood by reference to the subjoined sketch:

## SKETCH.

It appears from the evidence that plaintiff owned the timber on the various tracts in the two sections which are indicated on the sketch by the letter "S," and that the tracts indicated by the letters "P B," with the timber thereon, were owned by M. Coguenhem; that in May, 1905, Coguenhem sold his holdings to defendants, who had entered into an arrangement with Leonard & Angelloz for the deadening and pulling of the timber; and that they deadened, not only the timber on the tracts which defendants had thus acquired, but, also, that of which plaintiff was the owner, upon the other tracts.

After the work of deadening had been completed, however, Leonard & Angelloz made another arrangement with defendants, in consequence of which they gave up the pulling contract, and, in 1907, defendants employed Verret & Mayon to do that work, and Craighead to superintend it and sell the timber as it was taken out; and we find that in May, 1907, Gath, plaintiff's swamp manager, discovered the persons thus named pulling plaintiff's timber, and stopped them from so doing; that he had an interview with Craighead upon the subject, and was told to check up the timber that had been pulled, and that he (Craighead) would "fix the matter" with plaintiffs. The pulling went on, however, and the matter was not fixed; and on May 16, 1908, plaintiff's secretary wrote a letter to the defendant Peterman as follows:

"We find it strange that you do not write to us regarding timber which was pulled from S. W. ¼ of S. W. ¼, Sec. 31. * * * We sent our Phelias Gath out to Duck Lake and he reports that the timber which came from our land has been taken away, and same was measured by Mr. C. D. Craighead. As the matter is getting to be an old one, we would like you to send in settlement for the timber. We hope you will let us hear from you promptly."

It is true that Gath testifies that he did not make his discovery until 1908, and that he then, at once, notified plaintiff; and

plaintiff's secretary testifies that he wrote the above-quoted letter immediately upon receiving the notice; but, there is other testimony and documentary evidence which satisfy us that the pulling, to which Gath refers, was done in 1907, and from the expression, in the letter, "the matter is getting to be an old one," we conclude that, though the writer had but recently heard of it, from Gath, he had then been told that the pulling had been going on since the year before, as we see no reason to suppose that he would have delayed action in a matter of that kind for a year, after being informed about it.

The defendant Peterman answered the letter of May 16th, on May 20th, saying:

"Will attend to timber matter, and let you hear from me later."

But he did not attend to it, and plaintiff called his attention to it in letters of July 16th and November 20th; and, in due time, received a letter which Peterman, in effect, admits was dictated by him, but which bore no signature. It was dated November 25th, and reads:

"Your favor of the 20th to hand and noted. I am very sorry indeed to have caused you so much delay in settling for timber that was pulled from Duck Lake Swamp, but I wish to say that I have been waiting on a settlement from two of the parties that we sold the timber to, in fact, we are now in litigation with them, demanding a settlement. However, if nothing is done in the matter, soon, we will mail you amount of stumpage. Hoping that you will see your way clear to wait a short while longer, I remain, Yours very truly."

Mr. Peterman says, in his testimony:

"This letter, as I have said before, was, very probably, written in my office, and dictated by me, but I didn't sign it, and especially after making this notation in ink" (referring to the word "timber," which is said to appear on the original, though it is not in the transcribed copy). "I must have had some reason for not doing so. * * * I will say that this letter was not, to my knowledge, mailed by me, and possibly mailed by some one in my office. My impression is that, if I had intended to mail it, at that time, I would have signed it. I think that is about the only letter, if I did mail this one, that I mailed without my signature."

The evidence is conclusive that 162 trees, belonging to plaintiff, were pulled and sold for defendant's account and benefit from section 31, and it fails to disclose any sufficient reason why the letter in question should not have been signed and mailed; and, although the assurances therein contained were repeatedly referred to, in letters subsequently written to him by plaintiff, defendant never denied that he had dictated those assurances, nor has he given any good reason for not having mailed them. Between May 16, 1908, and November 5, 1908, inclusive, it appears that plaintiff wrote to defendant some nine letters, all of which, save the last, related to the depredation 'on section 31; and, during that period, no other letters were written by defendants save the two which have been mentioned.

On August 15, 1909, however, the "Rigg's Cypress Company, Limited," (of which defendant Peterman was president and general manager), through Mr. William Davis, who also was a person in authority, wrote to plaintiff, making an offer for certain lands owned by it, and concluding as follows:

"We are instructed to say, for Mr. Peterman, that, owing to the absence of Mr. Bell, he has been unable to adjust the matter of timber claimed to have been taken from your lands on Duck Lake. As soon as Mr. Bell returns, the matter will be taken up and prompt attention given to same."

In the course of his examination as a witness, the writer of the letter denied that he had received any such instructions as those referred to. He was then asked:

"Q. When you made that statement, on behalf of Mr. Peterman, are we to understand that the statement was made without the authority of Mr. Peterman?"

And he replied:

"I don't know that Mr. Peterman ever gave me any authority to make that statement."

Plaintiff's letter of November 5, 1909, reads, in part, as follows:

"In looking over our lands in section 36, * * * recently, we find that you have pulled the timber on the fractional N. E. ¼ of the S. E. ¼ of the N. E. ¼. We think the best way to settle the matter would be for us to go over the land and count the stumps and estimate the timber from the land, and you could settle accordingly. * * * We would, therefore, ask that you advise us, by return mail, when you, or your representative, could meet our representative, on the land, and look over same and estimate the timber taken therefrom, with a view to your settling same. We also call your attention to the fact that you have, so far, failed to settle for the timber pulled by you in the Duck Lake country. Don't you think this matter has been dragging long enough?"

Within a fortnight thereafter, plaintiff received a letter from Mr. Ed. Le Normand, saying:

"Your letters to Mr. Peterman, in regard to the Duck Lake timber, has (sic) been referred to me, and, as soon as I will be able to get out, I will attend to the matter and adjust the matter if he has cut any timber on you in section 36. * * *"

Some little correspondence with Le Normand then followed which resulted in the appointment of a meeting between that gentleman and Gath (plaintiff's timber man) on December 6th; but Gath met with an accident, and the meeting did not take place. Plaintiff then wrote, on December 13th, to Mr. Peterman, saying:

"We are to-day writing to Mr. J. F. Nutall * * * to represent us and go with Mr. Le Normand or some other party you may designate. We trust you will arrange a date promptly to send Mr. Le Normand or some other representative to do this work, and Mr. Nutall will go with him."

Mr. Nutall says, in his testimony, that, after receiving the request from plaintiff (to quote his language):

"I went up to see Mr. Peterman, and Mr. Peterman told me he had sold his timber that was out on Duck Lake, but I told him I had been authorized to go and make the estimate and came to see him about whom (he) was going to send with me. He told me he had no interest there, that he had sold his timber, but, if the Schwing people could show him that he had any of their property, he would pay them, and that, if I was going out there for the Schwing people, to report to him what I found and how I found it, which I did. After I got through, I made

my report in duplicate and sent Mr. Peterman a copy."

Mr. Nutall's letter, to Peterman & Bell, inclosing his report, bears date August 26, 1910, and reads, in part:

"I herewith mail your report of the estimate made of a portion of the lands of the Schwing Lumber & Shingle Company, Limited. * * * You will see from the report that we actually estimated only a portion of these lands, and approximated the balance. The land is sloughs and viney ridges, most of the hard wood has been blown down, making it very slow, tedious and expensive checking up the pulled timber. And, from what we saw of the different parts of the land, there is very little, if any, difference in the average amount of timber per acre; and we checked up only a portion of it, thinking it would be a sufficient amount in order to average the whole. Should you deem it necessary to do so, we will check over the balance of the land."

In the report thus referred to, Mr. Nutall estimates the quantity of plaintiff's timber that was taken from section 36 at 413,019 feet. Mr. Craighead testifies that he "worked in there four or five months," and further, as follows:

"Q. In making this agreement with you (referring to the agreement with Peterman & Bell under which he was doing the work), who showed you what land to take charge of? A. I don't remember whether it was Peterman or Bell that furnished me with a plat of that territory around there, with the numbers on it. Q. Well, it was one of those parties; either one or the other? A. Yes, it was one of the firm. Q. Did that embrace the land in Nos. 1 to 27(24), as testified to by you already? A. Why it included those lands and a good many more. Q. It included them? A. Yes, sir. Q. So the contract between Peterman & Bell (and you), itself, was to cut the timber from that land, from 1 to 24; and you were to receive 50 cents? A. For overlooking the work—50 cents per thousand feet. Q. Now, the timber that you cut from the lands along the Lake front, where was that sent? A. Portion of it to the Kyle Lumber Company, portion of it to the Berwick Ship Yard, Limited, and Brownell-Drews got some of it. Q. Do you know who got the money for the timber that was cut on that Lake front, on, say, lots 1, 8, and a little fraction, below 8, on the Lake front, that was not included in the numbers; and, also * * * 15, 22, and 23? A. Peterman & Bell got the money or the notes for it. * * * Q. (On cross-ex.) What lots did you work, Mr. Craighead, if you can tell? A. Well, I can't tell exactly; I could tell, about, from the map. (Examining the map.) Lots 1, 2, and 3; portion of lots 8, 9, and 10; all of lots 23 and 24; portion of lots 22 and 16; portion of lot 15. That is just about what I actually worked myself. * * * Q. You say Ed. Le Normand finished the work, after you left there? A. That is what I understand."

The defendant Peterman, as we have seen, informed Mr. Nutall that he had sold his interest about Duck Lake, and Mr. Davis testifies that the Riggs Cypress Company, of which defendant was president and general manager, became the purchaser, at $5.75 per 1,000 feet. Mr. Craighead, who was employed by the Riggs Company up to March, 1908, was succeeded by Mr. Le Normand, and it was Le Normand who took charge, under the orders of Mr. Peterman, acting as president and general manager of the Riggs Company, of the pulling of the timber which that company had thus acquired from Peterman & Bell, and which, as it appears, was assumed to have included plaintiff's timber. Le Normand testifies that he pulled there for about a month and a half, in the latter part of 1909, or in 1910, and that, when he left, Halloway was in charge, as foreman for the Riggs Company. He knew that he pulled from section 36, but was unable to follow the map and give the lines. He was under the impression, he says, that the sale from Peterman (or Peterman & Bell) to the Riggs Company included all the land, from the Lake shore back.

"I pulled timber," he continues, from the Lake shore to the back line, where the road was cut. * * * I knew the timber was supposed to belong to him and Mr. Bell, and I understood he had sold it to the Riggs Cypress Company, and they paid for the pulling of it."

He says that he fastened his pull boat to piles in Duck Lake and pulled from no other land than section 36; that the land on which he found the timber deadened, and from which he pulled, was that fronting on the Lake—between the Lake and the Peterman & Bell lands.

According to the testimony of Mr. Gath, he did not know until about November, 1909, that plaintiff owned any timber in section

36, and hence did not, until then, call attention to the depredation in that section. And, in that, he is corroborated by Mr. E. B. Schwing, plaintiff's secretary, who testifies that the tracts in section 36 were among a large number which had been acquired by Wisner & Dresser from the Archafalaya Levee board, and that the timber thereon had been acquired by plaintiff from Wisner & Dresser, who were large stockholders in the company; but that, up to the time of his discovery, Gath had not been furnished with any map showing those facts. His testimony reads, in part, as follows:

"Q. Mr. Schwing, Mr. Gath testified yesterday that he didn't know of the interest of your company in the lands described in this case (referring to section 36), and it was only by accident that he discovered it, in looking over matters in your office. Please explain why there was any ignorance on his part as to these tracts. A. The people who went into the sawmill business with us, Wisner & Dresser, of New Orleans, acquired these lands from the levee board, in several different parishes; that is, acquired a quantity of lands, scattered through three or four parishes, on which they sold us the cypress timber. In order to keep up with those lands—being new in the business, ourselves—we got them to furnish us maps of the different parishes, showing the lands which they owned, in colors, and we were guided, ourselves, in the operation of those different sections of land, by those maps, furnished by those people, who were, at the time, half owners in our company, and we relied on the information they gave us by maps. Later on, after being in the business several years, we discovered that there were some sections of land which had been omitted on those maps, and we secured from those people copies of the assessment lists, and, later on, made up maps from that, in our own office, making the corrections. At the time Mr. Gath reported to us the depredation on the land we owned in section 31, on Duck Lake, we were using the maps furnished us by Wisner & Dresser, and it was later that we discovered some inaccuracies in the painting of the sections on the map, and we asked and secured those assessment lists and then discovered that we owned cypress timber in section 36, on Duck Lake."

Defendants, through their counsel, accepted service of the original petition, and waived citation, on October 28, 1910, and indorsed a similar acceptance and waiver on the supplemental petition on November 4, 1910. The suit was not filed in court, however, until February 9, 1912.

### Opinion.

[1] On the exception that the suit was unauthorized:

The exception reads:

"That the plaintiff company was without right or authority to file said suit; that petitioner does not aver that it was authorized to bring said suit, and it was not, in fact, authorized to bring said suit, and is therefore without authority in the premises."

The capacity to appear in court for the protection of its rights is vested, by our law, in every corporation established thereunder (C. C. art. 433), and as the exception herein filed does not challenge plaintiff's corporate existence, and the suit purports to have been brought by it in its corporate capacity, and not by its president, for it, and, as the authority of its attorneys was not denied, under oath, the exception might, properly, have been overruled on its face. But plaintiff thought proper to introduce in evidence its charter, the testimony of its president, and a resolution of its board of directors (adopted long after the filing of the exception), ratifying the bringing of the suit, by the authority of the president; from all of which it appears that though the law and the charter authorizes the corporation to sue and be sued, the charter vests all the corporate authority in the board of directors, and confers no authority, whatever, and imposes no duty, on the president, save to preside over the meetings of the board of directors; but that, since the creation of the corporation, the president, with the tacit consent of the directors, acting individually and separately, has exercised all of the powers which the charter has conferred upon the board of directors, and that this suit was instituted by the authority thus assumed of the president. It is, no doubt, true that, in such cases, where contracts have been executed, or partially executed, the corporations, which have profit-

ed thereby, are usually held to be estopped to deny the obligations resulting therefrom, whilst retaining the profits; but where, as in this case, it is shown, in limine litis, by the corporation itself, that a suit has been brought in its name, but by no other authority than that of its president, wholly unauthorized for that purpose, the suit, under our jurisprudence, would have to be dismissed, the subsequent ratification of the board of directors notwithstanding to the contrary, were it not that, in 1914, the General Assembly passed an act which declares:

"That the president, vice president or manager of any corporation organized under the laws of Louisiana, or of a foreign corporation, doing business in this state, shall have power in the name and in behalf of the corporation to authorize the institution of any suit and other legal proceedings and no exception of want of authority shall lie on the part of any defendant." Act 267, of 1914, § 16, p. 527.

The legislation so enacted relates to the remedy, devests no vested rights, by operating upon pending litigation, and is decisive of the question here at issue. Black on Interpretation of Laws, p. 265 et seq.; 6 R. C. L. pp. 309, 318, 321. The exception was therefore properly overruled.

[2] On the exception of prescription.

Article 3537 of the Civil Code, as amended and re-enacted by Act 33 of 1902, p. 41, establishes the prescription of one year against actions in damages such as this, from the date knowledge of the damage is received by the owner of the timber "injured, cut, damaged or destroyed," and, as plaintiff received knowledge of the pulling of the 162 trees on section 31, the value of which is here claimed, at least, as early as May 16, 1908, and citation was not waived in this suit until October 28, 1910, it follows that that claim is prescribed, unless the prescription was interrupted, or the bar, having been established, was removed by a promise to pay, signed by the defendant. Conceding (arguendo merely) that the dictation of Peterman's unsigned letter of November 25, 1908 (the dictation having taken place

in the presence of Craighead), and the mailing of it to plaintiff, was a sufficient acknowledgment, under C. C. 3520, to interrupt the prescription, still more than a year elapsed thereafter, before the waiver of citation. The letter may therefore be dismissed as an element in the case.

Plaintiff's counsel, however, relies upon the following proposition (quoting from their brief), to wit:

"Where A. charges ·B. with having removed timber from A.'s land, and B. enters into negotiations to ascertain if he did so, and appoints experts to estimate the timber so removed, and carries on the negotiations with A., all tending to, and having for their aim, an adjustment of the controversy, and A. is held in abeyance during all of those negotiations, dependent upon the good faith of B. and his desire to settle, there is a suspension of prescription."

We know of no law which sustains the proposition as above stated, and have been referred to none.

In Stanbrough v. McCall, 4 La. Ann. 323 (cited by the counsel), it was held, on the rehearing (quoting from the syllabus, on page 324) that:

"Where a creditor, whose claim is secured by mortgage, may proceed against the same person by a personal action or by executory proceedings, the institution of proceedings via executiva will interrupt the prescription running against the personal action; and this interruption is continuous, preserving the personal action while the executory proceedings are being prosecuted; and vice versa. And where the mortgage contains the pact de non alienando, a purchaser from the mortgagor, subsequent to the mortgage, will be considered as standing in the place of the mortgagor, and as subject to the same liabilities."

The suspension of the prescription, in that case, resulted therefore, from the institution and prosecution of a proceeding in court, to enforce the payment of the debt.

In Meyer v. Ludeling, 40 La. Ann. 641, 4 South. 583, also cited by counsel, it was held (quoting the syllabus) that:

"A submission to arbitration of the matter, embraced in the subsequent litigation, and a suit in affirmance of the award, praying that it be made executory, constitute a legal interruption of prescription."

As to the claim to the 162 trees, taken from section 31, therefore, the plea of prescription was properly sustained.

[3] As to the claim arising from the depredation on section 36, our learned Brother of the district court reached the conclusion that, if plaintiff did not acquire knowledge thereof when informed of the depredation on section 31, it should have done so, and, upon that basis, maintained the plea of prescription. We are unable to concur in that view. The testimony of Gath and of plaintiff's secretary, to the effect that neither of them knew that the timber on section 36 belonged to plaintiff, when the depredation on section 31 was discovered, and that information as to the depredation on section 36 was not conveyed to plaintiff, none of whose officers appear ever to have seen the land, until November 5, 1909, is uncontradicted, and the explanation of the delay appears to us to be entirely reasonable; wherefore, as the service was accepted and the citation in this case waived within a year from that date, the plea of prescription should have been overruled.

## On the Merits.

We find no reason to doubt that defendant received the proceeds of 413,019 feet of timber, found and estimated by Nutall to have been removed from section 36. That which was delivered to the Kyle Lumber Company, the Berwick Ship Yard & Manufacturing Company, and the Jeannerette Lumber Company, was paid for at from $10 to $12 per 1,000 feet, which price, however, included the cost of delivery; that which was pulled under the direction of the defendant Peterman, from section 36, after Peterman and the Riggs Company had been notified of plaintiff's claim with regard to that section, was delivered to the Riggs Company at the stump, and defendants were, presumably, paid for it at the rate of $5.75 per 1,000 feet, which is about the only valuation

that the evidence enables us to arrive at as the basis of our judgment.

It is therefore ordered that the judgment appealed be annulled, and that there now be judgment in favor of plaintiff, the Schwing Lumber & Shingle Company, Limited, and against the defendants, Peterman & Bell, and Wilson T. Peterman and John D. Bell, in solido, in the sum of $2,374.75, with interest thereon from the rendition of this judgment. It is further ordered that said defendants pay all costs.

O'NIELL, J., takes no part.

### On Rehearing.

LAND, J. In this case the rehearing was granted "as to the quantity of timber removed," and the applications for rehearing were otherwise refused.

The petition alleged that the defendants had "pulled and removed" 393,019 feet of cypress timber from the S. W. ¼ of the N. E. ¼, the N. E. ¼ of N. W. ¼, S. E. ¼ of N. W. ¼, N. E. ¼ of S. W. ¼, W. ½ of S. E. ¼ and the E. ½ of S. E. ¼ of section 36, township 14 S., range 11, E.

In a supplementary petition, the plaintiff claimed $5,000 additional damages for the depreciation in value of timber left standing after having been worked upon, preparatory to cutting and removal from the premises, and $5,000 more for loss of or additional expense in cutting and pulling the remainder of the timber.

Defendants' contention that our decree was erroneous in allowing the plaintiff the value of 413,019 feet of timber as taken from section 36, when plaintiff only asked judgment for 393,019 feet, is well taken (C. P. 156), but cuts no figure in the final result.

Defendants also contend that Nutall's report does not show the removal by the defendants of more than 77,638 feet from section 36.

It seems to be conceded that this question

of quantity must be determined by the testimony and report of Nutall, a surveyor and timber estimator employed by the plaintiff company to make a survey and estimate of timber taken from their lands, in conjunction with another expert to be appointed by the defendants.

Nutall testified that he called the defendant Peterman, who said that he had sold his interest in the timber, but that, if the Schwing people could show him that he had any of their property, he would pay them; that Peterman further said to Nutall that, if he was going out there for the Schwing people, to report to him what he found and how he found it; and that Nutall, after finishing the work, sent a duplicate copy of his report to said Peterman.

Nutall reported 168,548 feet of lumber, including in some cases old trees, which had been cut into or deadened and left on the ground, as removed or taken in section 36.

Nutall in his estimates allowed for sap rot on the timber on the ground. Nutall did not make an estimate of all the lands claimed by plaintiff, because of sickness.

Gath and Thompson finished the work by estimating the timber removed from the S. E. ¼ of section 36. They reported 514 trees, averaging 400 feet, a total of 206,600 feet. Add Nutall's 168,548 feet, and we have a total of 375,148 feet, removed or severed from the soil.

Plaintiff sued for 393,014 feet relying on an estimate, without inspection and count, made by Nutall, of timber taken from S. E. ¼ of section 36, the same land referred to in the report of Gath.

We agree with counsel for defendants that the only question before the court on this rehearing is that of quantity.

The best evidence as to quantity, in cases like this, are the reports of such experts as testified in the court below, based on actual inspection and count.

Such reports, corroborated by the testimony of the experts, must be accepted as true, until shown to be erroneous by direct and convincing evidence.

It follows that our former decree should be amended by reducing the amount awarded against the defendants from $2,374.75 to $2,157.10, and, as thus amended, should be reinstated and made the final judgment of the court; and it is so ordered.

SOMMERVILLE, J., takes no part.

O'NIELL, J., takes no part.